# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### ASHEVILLE DIVISION
### CIVIL CASE NO. 1:19-cv-00048-MR

| | | |
|---|---|---|
| JAMES ANTHONY BARNETT, JR., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **MEMORANDUM OF** |
| vs. | ) | **DECISION AND ORDER** |
| | ) | |
| JEFFREY DEAN PATANE, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**THIS MATTER** is before the Court on Motions for Summary Judgment filed by Defendants Keisha W. O'Keefe [Doc. 63] and Jeffrey Dean Patane [Doc. 66]. Also pending is the Plaintiff's *pro se* Declaration for Entry of Default against Defendant Tamara Allen [Doc. 71].

## I. BACKGROUND

The incarcerated Plaintiff James Anthony Barnett, Jr. ("Barnett" or simply, "the Plaintiff"), proceeding *pro se*, filed this action pursuant to 42 U.S.C. § 1983 addressing incidents that allegedly occurred at the Mountain View Correctional Institution ("MVCI").[1] The Defendants are: Jeffrey Dean

_____

[1] The Plaintiff filed the Complaint while he was incarcerated at the Scotland Correctional Institution and his address of record is at the Pasquotank Correctional Institution. A review of the North Carolina Department of Public Safety's ("NCDPS") website reveals that the Plaintiff now resides at the Eastern Correctional Institution. See chrome-extension://hehijbfgiekmjfkfjpbkbammjbdenadd/nhc.htm#url=https://webapps.doc.state.n

Patane, a physician's assistant at MVCI ("PA Patane"); Keisha W. O'Keefe, a licensed practical nurse at MVCI ("LPN O'Keefe"); and Tamara L. Allen, a registered nurse at MVCI ("Nurse Allen"). The Plaintiff's claims of deliberate indifference to a serious medical need against all three Defendants and a claim of retaliation against Defendant O'Keefe passed initial review.[2] [Doc. 26: Second Am. Compl.]. The Plaintiff seeks punitive damages and any additional relief that the Court deems just, proper, and equitable. [Id. at 5].

All three Defendants were served and filed Answers. [Docs. 32, 39, 43, 44]. Counsel for Nurse Allen was permitted to withdraw from representing her during discovery after Allen stopped communicating with counsel. [Docs. 52, 55]. The Plaintiff has filed a Declaration for Entry of Default against Defendant Allen, arguing that she failed to answer or otherwise respond to the Complaint. [Doc. 71].

PA Patane and LPN O'Keefe have filed Motions for Summary Judgment. [Docs. 63, 66]. The Court notified the Plaintiff of the opportunity

_____

c.us/opi/viewoffender.do?method=view&offenderID=0591420&searchOffenderId=0591420&searchDOBRange=0&listurl=pagelistoffendersearchresults&listpage=1. See Fed. R. Ev. 201.

[2] The operative Second Amended Complaint presents the same Defendants and claims as the Amended Complaint. [See Doc. 12: Am. Compl.; Doc. 15: Order on Initial Review of the Am. Compl.; Doc. 22: Order Gr. Motion for Leave to Amend]. This case was assigned to Judge Frank D. Whitney at that time.

to respond to Defendants' Motions and to present evidence in opposition pursuant to Fed. R. Civ. P. 56. [Doc. 69: <u>Roseboro</u>[3] Order]. The Plaintiff was granted an extension of time to respond but he failed to do so and the time has now expired.[4] [Doc. 72]. Having been fully briefed, this matter is ripe for disposition.

## II.    STANDARD OF REVIEW

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). A fact is material only if it might affect the outcome of the suit under governing law. <u>Id.</u>

The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with

---

[3] <u>Roseboro v. Garrison</u>, 528 F.2d 309 (4th Cir. 1975).

[4] The Plaintiff wrote the Court a Letter, dated June 5, 2021, inquiring about the case's status, and referring to an "Opposition to Defendants' Motion for Summary Judgment" that he had purportedly mailed to the Court. [Doc. 75 at 1]. On August 2, 2021, the Clerk of Court mailed the Plaintiff a Letter informing him that no such document was ever received by the Court, and providing him with a copy of the docket sheet. The Plaintiff has not resent any such Opposition for refiling or responded to the Clerk's Letter.

the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal citations omitted).

Once this initial burden is met, the burden shifts to the nonmoving party. The nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Id. at 322 n.3. The nonmoving party may not rely upon mere allegations or denials of allegations in his pleadings to defeat a motion for summary judgment. Id. at 324. Rather, the nonmoving party must oppose a proper summary judgment motion with citation to "depositions, documents, electronically stored information, affidavits or declarations, stipulations …, admissions, interrogatory answers, or other materials" in the record. See id.; Fed. R. Civ. P. 56(c)(1)(a). Namely, the nonmoving party must present sufficient evidence from which "a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. To that end, only evidence admissible at trial may be considered by the Court on summary judgment. Kennedy v. Joy Technologies, Inc., 269 Fed. App'x 302, 308 (4th Cir. 2008) (citation omitted).

When ruling on a summary judgment motion, a court must view the evidence and any inferences from the evidence in the light most favorable to the nonmoving party. Anderson, 477 U.S. at 255. Facts, however, "must be

4

viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts."  Scott v. Harris, 550 U.S. 372, 380, 127 S.Ct. 1769, 1776 (2007).  As the Supreme Court has emphasized,

> "[w]hen the moving party has carried its burden under Rule 56(c), the opponent must do more than simply show there is some metaphysical doubt as to the material facts ....  Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87, 106 S. Ct. 1348 (1986) (footnote omitted).  "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-28, 106 S. Ct. 2505 (1986).  When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.

Scott, 550 U.S. at 380, 127 S.Ct. at 1776.

## III.  FACTUAL BACKGROUND

Viewing the parties' forecasts of evidence in the light most favorable to the Plaintiff, the following is a recitation of the relevant facts.

PA Patane saw the Plaintiff on September 5, 2018 at 9:55 a.m. at the Plaintiff's cell for a chief complaint of chest pain.  [Doc. 68-2: Patane Ex 2 at 2; Doc. 68: Patane Affid. at ¶¶ 12, 15].  PA Patane was accompanied by

Nurse Brandon Barrier,[5] who took the Plaintiff's vital signs. [Doc. 68-2: Patane Ex at 2; Doc. 68: Patane Affid. at ¶ 13]. The Plaintiff appeared well and was pleasant and cooperative. [Doc. 68: Patane Affid. at ¶ 14]. The Plaintiff and PA Patane discussed medications for hypertension and seizures, and the Plaintiff requested opioid pain medications for pain due to his history of priapism.[6] [Doc. 68-2: Patane Ex 2 at 2; Doc. 68: Patane Affid. at ¶¶ 16-17]. "Consistent with [Patane's] training and experience, as well as NCDPS policy," PA Patane declined to prescribe opioids for pain. [Doc. 68: Patane Affid. at ¶ 18]. Defendant Patane did, however, enter an order for 10 mg of Amitriptyline[7] "a tri-cyclic anti-depressant that is commonly used for nerve pain, headaches, and pain relief, to treat his complaints of pain." [Doc. 68-2: Patane Ex 2 at 3; Doc. 68: Patane Affid. at ¶ 18]. The Plaintiff indicated that he was comfortable with this plan and did not have any complaints of a current priapism or of urine retention. [Doc. 68: Patane Affid. at ¶ 19; Doc. 68-2: Patane Ex 2 at 4].

---

[5] Nurse Barrier is not a Defendant in this case.

[6] Priapism is an "erection that lasts for more than 4 hours [and] is usually painful…." See https://www.webmd.com/erectile-dysfunction/erectile-dysfunction-priapism (last visited Jan. 14, 2022).

[7] This medication is also referred to by its brand name, Elavil. [See Doc. 86-2: Patane Ex 2 at 2].

6

Later that day, the Plaintiff declared a medical emergency for priapism and he provided a urine specimen for a nurse at approximately 9:10 p.m. [Doc. 12-1 at 14: Plaintiff Affid. at ¶ 2; Doc. 68-4: Patane Ex 4 at 2]. Nurse Claudia Hughes[8] saw the Plaintiff at 9:34 p.m. [Doc. 68-4: Patane Ex 4 at 2]. The Plaintiff complained of pain from priapism that had begun six to 12 hours earlier. [Id.]. The Plaintiff requested Oxycodone and refused any other pain medications. [Id. at 4]. Nurse Hughes noted that Plaintiff did not have priapism when she examined him. [Id. at 3-4]. A dipstick urinalysis was normal. [Id. at 4]. Nurse Hughes noted that the Plaintiff would be referred to the provider and that he should follow up at sick call as needed. [Id.]. PA Patane learned of the 9:34 p.m. encounter between the Plaintiff and Nurse Hughes when he arrived at work the following morning, September 6, 2018. [Id. at 5; Doc. 68-3: Patane Ex 3 at 2; Doc. 68: Patane Affid. at ¶ 20].

The Plaintiff went into urine retention sometime between September 5 at 9:10 p.m. and September 6 at 5:20 a.m. [Doc. 12-1 at 14: Plaintiff Affid. at ¶ 3]. The Plaintiff continually pressed the call button and requested emergency medical help for pain and the inability to urinate between approximately 10:00 a.m. and 12:13 p.m. on September 6. [Id. at ¶¶ 4-5].

---

[8] Nurse Hughes is not a Defendant in this case.

The Plaintiff explained to Officer Phillips,[9] who answered each time Plaintiff pressed the call button, that his kidneys, lower back, and abdomen were in severe pain. [Id. at ¶¶ 6-7]. Officer Phillips told the Plaintiff that he "notified medical of the situation" each time Plaintiff pressed the call button. [Id. at ¶ 6].

LPN O'Keefe came to see the Plaintiff at approximately 12:25 p.m. on September 6.[10] [Id. at ¶ 8]. The Plaintiff told LPN O'Keefe that he had noticed swelling in his groin area, had not urinated since approximately 10:00 p.m. the prior evening, and that his pain level was 10 on a scale from 0 to 10. [Id. at ¶ 8; Doc. 65-4: O'Keefe Decl. at ¶ 6; Doc. 68-6: Patane Ex 6 at 2]. LPN O'Keefe took Plaintiff's blood pressure and charted it as 148/106 [Doc. 65-4: O'Keefe Decl. Ex. A at 4], however, according to the Plaintiff, his blood pressure was 142/124 [Doc. 12-1 at 14: Plaintiff Affid. at ¶ 8]. The Plaintiff refused further assessment, stating the swelling was gone and now he just hurts. [Doc. 65-4: O'Keefe Decl. at ¶¶ 6-7]. O'Keefe charted that the Plaintiff had no signs and symptoms of acute distress and declined to be assessed. [Id. at ¶ 6; Doc. 68-6: Patane Ex 6 at 2]. The Plaintiff was instructed to notify

---

[9] Officer Phillips is not a Defendant in this case.

[10] According to LPN O'Keefe, she completed a nursing assessment of the Plaintiff at 1:40 p.m. on September 6. [Doc. 65-4: O'Keefe Decl. at ¶ 6].

medical if there was no improvement or if the condition worsens. [Doc. 65-4: O'Keefe Decl. at ¶ 6; Doc. 68-6: Patane Ex 6 at 2]. The Plaintiff indicated that he understood. [Doc. 65-4: O'Keefe Decl. at ¶ 6; Doc. 68-6: Patane Ex 6 at 2-3]. LPN O'Keefe told Plaintiff that she would talk to the PA, and left the room. [Doc. 12-1 at 14: Plaintiff Affid. at ¶ 8].

PA Patane reviewed the Clinical Encounter for the Plaintiff's visit with O'Keefe at 2:15 p.m. on September 6. [Doc. 68-6: Patane Ex 6 at 2; Doc. 68-5: Patane Ex 6 at 4; Doc. 68: Patane Affid. at ¶ 23]. In addition, LPN O'Keefe verbally reported the incident to PA Patane shortly after seeing the Plaintiff. [Doc. 68: Patane Affid. at ¶ 25].

PA Patane, who knew of Plaintiff's "medical history and … urinary retention problems" [Doc. 12-1 at 14: Plaintiff Affid. at ¶ 23], went to speak to the Plaintiff at his cell at approximately 3:41 p.m.[11] [Id. at ¶ 9]. The Plaintiff stated that his pain had not improved since Patane saw him the day before. [Doc. 68: Patane Affid. at ¶ 29]. PA Patane observed that Plaintiff was able to stand up from his bed and approach the door to speak with him. [Id. at ¶ 28]. The Plaintiff was able to "freely move around his cell without discomfort" and he did not appear to be experiencing any discomfort consistent with

---

[11] According to PA Patane, he saw the Plaintiff at 3:48 p.m. on September 6. [Doc. 68-7: Patane Ex 7 at 2; Doc. 68: Patane Affid. at ¶ 26].

priapism and urine retention. [Id.]. At that time, "it was not indicated based on the totality of his symptoms and presentation for him to be transferred to an outside facility or to be catheterized especially in light of his having been able to provide urine for a urinalysis at 11:27 AM that morning."[12] [Id. at ¶ 46]. Accordingly, PA Patane decided to increase the dosage of Amitriptyline to 25 mg. [Doc. 12-1 at 14: Plaintiff Affid. at ¶ 9; Doc. 68-7: Patane Ex 7 at 2-3; Doc. 68: Patane Affid. at ¶ 29]. PA Patane told Plaintiff that he had prescribed Amitriptyline for pain for the Plaintiff's idiopathic ischemic stuttering priapism and started to walk away.[13] [Doc. 12-1 at 14: Plaintiff Affid. at ¶ 9; Doc. 68-7: Patane Ex 7 at 3]. The Plaintiff called PA Patane back and asked what he was going to do about all the urine in his body and the pain in his lower back, kidneys, and abdomen; Patane responded that "[Patane is] the medical guy and [is not] worried about it." [Doc. 12-1 at 14: Plaintiff Affid. at ¶ 9]. PA Patane was "verbally disrespectful" and walked away without offering any treatment for Plaintiff's urine retention. [Id. at ¶ 10]. PA Patane was at MVCI and knew of Plaintiff's "medical situation"

_____

[12] This appears to refer to the September 5 urinalysis that PA Patane reviewed at 11:27 on September 6. [See Doc. 68-4: Patane Affid. Ex 4 at 2-5].

[13] According to PA Patane, the medication dosage increase was explained to Plaintiff and he seemed agreeable. [Doc. 68: Patane Affid. at ¶ 29].

between 9:00 a.m. and 6:00 p.m. on September 6, 2018 but offered him no other treatment.[14]  [Id. at ¶ 12].

The Plaintiff "constantly" requested emergency medical help between 3:47 p.m. on September 6 and 1:17 a.m. on September 7, 2018, but no medical personnel came to see him during that time.  [Id. at ¶ 11].

Nurse Heather Thomas-Jenkins[15] saw the Plaintiff at around 1:17 a.m. on September 7.[16]  [Doc. 68-8: Patane Ex 8 at 2].  The Plaintiff reported urine retention and pain.  [Doc. 12-1 at 14: Plaintiff Affid. at ¶ 13; Doc. 68-8: Patane Ex 8 at 2].  Nurse Thomas-Jenkins told Plaintiff "that [PA] Patane, said – notes – that [Plaintiff] refuse[d] treatment earlier" and Plaintiff "immediately told Nurse Thomas, that was a lie and that no one came to examine [him] at all."  [Doc. 12-1 at 14: Plaintiff Affid. at ¶ 13].  Nurse Thomas-Jenkins noted that the Plaintiff was not in distress and did not appear pale, cyanotic, or sweating.  [Doc. 68-8: Patane Ex 8 at 4].  Nurse Thomas-Jenkins felt Plaintiff's belly, which was extremely hard, and took his blood pressure, which was 158/110.  [Doc. 12-1 at 14: Plaintiff's Affid. at ¶¶ 14-15; Doc. 68-

---

[14] According to PA Patane, he left for the day at around 5:30 p.m. when his shift ended. [Doc. 68: Patane Affid. at ¶ 47].

[15] Nurse Thomas-Jenkins is not a Defendant in this case.

[16] According to the Defendants, Nurse Jenkins saw the Plaintiff at 1:54 a.m.  [Doc. 68: Patane Affid. at ¶ 30; Doc. 68-8: Patane Ex 8 at 2].

8: Patane Ex 8 at 4]. Nurse Thomas-Jenkins consulted with the on-call provider, and the Plaintiff was sent to Blue Ridge Regional's Emergency Department for evaluation. [Doc. 12-1 at 14: Plaintiff Affid. at ¶¶ 14-16; Doc. 68-8: Patane Ex 8 at 5; Doc. 68: Patane Affid. at ¶ 30].

The Plaintiff did not have an erection upon arrival at Blue Ridge Regional and initially voided about 420 cc of urine.[17] [Doc. 12-1 at 14: Plaintiff Affid. at ¶ 17; Doc. 68: Patane Affid. at ¶ 31; Doc. 68-9: Patane Ex 9 at 2]. After a catheter was placed, he voided another 600 cc of urine. [Doc. 12-1 at 14: Plaintiff Affid. at ¶¶ 17-18; Doc. 68: Patane Affid. at ¶ 31; Doc. 68-9: Patane Ex 9 at 2; Doc. 68-10: Patane Ex 10 at 2]. The Plaintiff appeared "uncomfortable but not toxic" with normal vital signs, a normal urinalysis, and normal kidney function.[18] [Doc. 68-9: Patane Ex 9 at 2-3; Doc. 68: Patane Affid. at ¶ 31]. The Plaintiff was given morphine for pain and was discharged back to MVCI at approximately 5:00 a.m. with instructions to continue the catheter for two to three days and to follow up

---

[17] According to the Defendants, the amount of urine that the Plaintiff initially voided was 400 cc. [Doc. 68: Patane Affid. at ¶ 31; Doc. 68-9: Patane Ex 9 at 2].

[18] The Plaintiff states in his affidavit that he was "minutes away from [his] bladder rupturing or kidneys shutting down....," and that PA Patane "placed [his] life and health in danger..." by refusing to examine him provide competent treatment. [Doc. 12-1 at 14: Plaintiff Affid. at ¶¶ 20, 22]. However, the Plaintiff has not supported these medical conclusions with a forecast of admissible evidence. See Fed. R. Ev. 701, 702.

with a urologist. [Doc. 12-1 at 14: Plaintiff Affid. at ¶ 19; Doc. 68: Patane Affid. at ¶ 32; Doc. 68-9: Patane Ex 9 at 3, 7].

PA Patane saw the Plaintiff for a follow-up assessment at 1:55 p.m. on September 7. [Doc. 68-10: Patane Ex 10 at 2; Doc. 68: Patane Affid. at ¶ 33]. The Plaintiff had a catheter and appeared well. [Doc. 68-10: Patane Ex 10 at 2; Doc. 68: Patane Affid. at ¶ 33]. The Plaintiff was cooperative, said he was familiar with self-catheterization, and was comfortable. [Doc. 68-10: Patane Ex 10 at 3; Doc. 68: Patane Affid. at ¶ 33]. PA Patane ordered Flomax and self-catheterization every two hours and, as the Plaintiff no longer appeared to be in pain, he discontinued Amitriptyline. [Doc. 68-10: Patane Ex 10 at 3; Doc. 68: Patane Affid. at ¶ 34]. PA Patane explained that he would be filing a Utilization Review ("UR") request for a referral to a urologist as soon as possible and Plaintiff said he understood. [Doc. 68-10: Patane Ex 10 at 2-3; Doc. 68: Patane Affid. at ¶ 35].

PA Patane submitted an urgent request for UR approval for a urologist consultation "asap" on 4:28 p.m. on September 7. [Doc. 68-11: Patane Ex 11 at 2; Doc. 68: Patane Affid. at ¶ 36]. This was approved on September 10. [Id.]. PA Patane continued to monitor the Plaintiff and, on September 11, prescribed Cardura and renewed the order for Flomax to aid his urine retention. [Doc. 68: Patane Affid. at ¶ 37].

The Plaintiff was seen by Linda Gale PA,[19] with Mission Health Urology at Blue Ridge Regional on September 21, 2018. [Doc. 68-13: Patane Ex 13 at 2; Doc. 68: Patane Affid. at ¶ 38]. The catheter was removed and PA Gale recommended continuing Flomax and Cardura, with Plaintiff's self-catheterizing if needed, and a follow up check in two weeks. [Id.]. PA Patane submitted a UR request for the urology follow-up on September 24, 2018 as an "urgent" request, then submitted a corrected request on September 26 as a "rush" request. [Doc. 68: Patane Affid. at ¶ 39; Doc. 68-10: Patane Ex 14 at 2-3]. However, on September 27, the Plaintiff refused to sign a records release which was needed for his follow-up appointment. [Doc. 68: Patane Affid. at ¶ 41; Doc. 68-17: Patane Ex 17 at 2]. The UR request was cancelled as a result of the Plaintiff's refusal to sign the records release. [Id.].

The Plaintiff was transferred to Scotland CI on November 14, 2018. [Doc. 68: Plaintiff Affid. at ¶ 42; Doc. 68-18: Patane Ex 18 at 2].

On September 6, 2018, the Plaintiff filed Grievance No. 4855-2018-NSEG-8870 addressing PA Patane's failure to examine and treat him for urine retention on September 5.[20] [Doc. 12-1: Am. Compl. Ex at 4-7]. The

---

[19] PA Gale is not a Defendant in this case.

[20] The Plaintiff refers to Grievance No. 4855-2018-NSEG-8870 as his "second grievance." [Doc. 26: Second Am. Compl. at 11].

grievance was rejected because the Plaintiff already had an active grievance in process. [Id. at 3]. Also on September 6, the Plaintiff sent letters to Paula Smith,[21] the NCDPS medical director, and Kenneth Lassiter,[22] the NCDPS director of prisons at the time, regarding his medical care and a hunger strike. [Id. at 9, 11]. On September 24, 2018, the Plaintiff mailed the September 6 grievance and letters to North Carolina Prisoner Legal Services ("NCPLS"), requesting that counsel forward them to the NCDPS director of prisons on his behalf. [Id. at 1-2]. On November 8, 2018, NCPLS mailed the Plaintiff a letter noting that the original documents had been returned to the Plaintiff and asking whether he would still like the grievance to be forwarded to Mr. Lassiter. [Id. at 26].

On December 6, 2018, the Plaintiff filed Grievance No. 4855-2018-NSEG-09740 addressing an incident on October 2, 2018 when the Plaintiff asked PA Patane "why he left [Plaintiff] in [his] cell in severe and extreme pain when [Patane] knew that [Plaintiff] was in urinary retention and had a medical condition which requires [Plaintiff] to self cath … and why he was steady denying [Plaintiff] pain medication for [his] chronic illness of 'chronic idiopathic ischemic studying [sic] priapism.'" [Doc. 5: Admin Remedy Stmt.

---

[21] Dr. Smith is not a Defendant in this case.

[22] Mr. Lassiter is not a Defendant in this case.

Ex at 2-3]. The grievance indicates that PA Patane responded that Plaintiff would not be getting pain medication and that he "[does not] care what [Plaintiff's] urologist and urology report say[]." [Doc. 5: Admin Remedy Stmt. Ex at 2-3]. The grievance asserts that Patane's "actions and response to [Plaintiff's] question was deliberate indifference to a serious medical need." [Id. at 3]. The Step One response recommends that no further action be taken because the Plaintiff "was seen by the provider on 10/2/18" and, "[b]ased on documentation[,] the offender was treated appropriately by the provider." [Id. at 4]. The Plaintiff appealed to Step Two, and no further action was recommended because the Plaintiff was "seen and treated per protocol." [Id. at 5]. The Plaintiff's Step Three appeal was dismissed on January 23, 2019 because prison staff took "appropriate action to address and resolve the offender's concerns voiced in the grievance." [Id. at 6].

## IV. DISCUSSION

### A. Exhaustion

The Prison Litigation Reform Act ("PLRA") requires a prisoner to exhaust his administrative remedies before filing a § 1983 action. 42 U.S.C. § 1997e(a). The PLRA provides, in pertinent part, that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other

correctional facility until such administrative remedies as are available are exhausted." Id. PLRA's exhaustion requirement applies to all inmate suits about prison life. Porter v. Nussle, 534 U.S. 516, 532 (2002). There is "no question that exhaustion is mandatory under PLRA and that unexhausted claims cannot be brought in court." Jones v. Bock, 549 U.S. 199, 211 (2007) (citing Porter, 534 U.S. at 524). The PLRA requires "proper" exhaustion, which means "using all steps that the agency holds out, and doing so properly (so that the agency addresses the issues on the merits)." Woodford v. Ngo, 548 U.S. 81, 90 (2006) (quoting Pozo v. McCaughtry, 286 F.3d 1022, 1024 (7th Cir. 2002)). The exhaustion of administrative remedies must occur before a civil action is commenced. Porter, 534 U.S. at 516. A prisoner may not exhaust her administrative remedies during the pendency of a § 1983 action. Germain v. Shearin, 653 F. App'x 231, 234 (4th Cir. 2016); French v. Warden, 442 F. App'x 845, 846 (4th Cir. 2011).

NCDPS has established a three-step procedure governing submission and review of inmate grievances, which it refers to as the Administrative Remedies Procedure ("ARP"). See N.C. Gen. Stat. § 148-118.1 *et seq.*; Moore v. Bennette, 517 F.3d 717, 721 (4th Cir. 2008). Under the ARP, an inmate must submit a grievance at step one and then may appeal an unfavorable decision from step one at steps two and three. Id. A decision

at step three of the ARP exhausts the prisoner's remedies under the PLRA. "If at any level of the administrative remedy process, … the inmate does not receive a response within the time provided for reply, … the absence of a response shall be a denial at that level which the inmate may appeal…." NCDPS Policy & Procedure § G.0307(f)(5).

In the Second Amended Complaint, the Plaintiff alleges that he filed a "first grievance" about "priapism and prolonged erection and failure to examine [him] and evaluate [him] and make the proper decisions to treat [him] for … prolonged (> 24 hrs) retention," however, he has not forecast any admissible evidence about that grievance. [Doc. 26: Second Am. Compl. at 11]. In any event, he admits that the grievance was unexhausted, stating that he "never had a chance to appeal" and that "[t]he grievance process is not complete" because he "never received step one so that [he] could appeal to step two and then appeal to step three…." [Id.].

The "second grievance," filed on September 6, 2018, addresses the events of September 5, 2018. [Doc. 12-1: Am. Compl. Ex at 4]. That grievance was rejected because another grievance was already in process at the time. [Id. at 3]. The Plaintiff mailed the September 6 grievance to NCPLS, asking counsel to forward them to the director of prisons. [Doc. 12-1: Am. Compl. Ex at 1]. However, the Plaintiff has not forecast any evidence

18

that the grievance was actually submitted and that he appealed through Step Three of the ARP, or that he filed an appeal upon receiving no grievance response.

The Plaintiff filed a third grievance on December 6, 2018, addressing an interaction he had with PA Patane on October 2, 2018. [Doc. 5: Admin. Remedy Stmt. Ex at 2-3]. That grievance does not mention the incidents of September 5 and 6, which occurred outside the 90-day period to timely file a grievance. [See Doc. 5: Admin. Remedy Stmt. Ex at 4-6 (Step One Response addressing the October 2 interaction between the Plaintiff and Patane); NCDPS Policy & Procedure G.0306(c)(2) (a grievance may be rejected if … "[t]here has been a time lapse of more than ninety (90) days between the alleged event and submission of the grievance…."); NCDPS Policy & Procedure G.0310(c)(3) (Inmate Grievance Examiner review is "limited to specific issues brought forward in the grievance")].

The facts conceded by the Plaintiff in his Second Amended Complaint constitute an admission that he failed to exhaust his administrative remedies with regards to the Defendants' alleged actions and failure to act in his first and second grievances. His non-receipt of a response at each level of the APR does not excuse his failure to appeal. The relevant Policy and Procedure provides that the lack of a response at any level may be

19

considered a denial. NCDPS Policy & Procedure § G.0307(f)(5). The Plaintiff admits that he failed to appeal each level of the APR when he did not receive a response.[23] Further, although the December 6 grievance was fully exhausted, it did not fairly notify prison officials that he was attempting to refer to the incidents of September 5 and 6. See Wilcox v. Brown, 877 F.3d 161, 167 n.4 (4th Cir. 2017) (a grievance must be sufficient to alert the prison to the nature of the wrong for which redress is sought such that the prison has received notice of, and an opportunity to correct, a problem).

Therefore, his present claims are unexhausted and the Defendants are entitled to dismissal without prejudice.[24] See Dillard v. Anderson, No. 2:13-CV-31-FDW, 2010 WL 9553022, at *2 n.2 (W.D.N.C. Sept. 6, 2010) (Whitney, C.J.). ("A dismissal for failure to exhaust administrative remedies is without prejudice."). Accordingly, the Defendants' Motion for Summary Judgment will be granted on this ground.

---

[23] The Plaintiff does not suggest that the APR was unavailable to him.

[24] This applies equally to Defendant Allen even though she did not file a dispositive motion. See 28 U.S.C. § 1915(e)(2) (the court shall dismiss the case **at any time** if the court determines that … the action … is frivolous or malicious [or] fails to state a claim upon which relief can be granted….") (emphasis added); Custis v. Davis, 851 F.3d 358, 361 (4th Cir. 2017) (*sua sponte* dismissal is appropriate where lack of exhaustion is apparent on the face of the complaint).

20

Because dismissals based on the failure to exhaust administrative remedies are without prejudice, the Court will also address the other grounds for summary judgment asserted by Defendants.

### B.    Deliberate Indifference to a Serious Medical Need

The Plaintiff alleges in his Second Amended Complaint that: LPN O'Keefe refused to examine him for urine retention and priapism, refused to refer him to the medical provider, and falsified his medical records [Doc. 26: Second Am. Compl. at 6, 8]; Nurse Allen witnessed LPN O'Keefe's actions yet failed to examine Plaintiff, treat him, and refer him to the medical provider [id. at 6, 9]; PA Patane refused to examine Plaintiff for urine retention and priapism, and provide appropriate treatment [id. at 5, 8]; and PA Patane denied the Plaintiff a follow-up appointment with his urologist [id. at 7].

To state a claim for deliberate indifference to a serious medical need, a plaintiff must show that he had serious medical needs and that the defendant acted with deliberate indifference to those needs.  Heyer v. United States Bureau of Prisons, 849 F.3d 202, 210 (4th Cir. 2017) (citing Iko v. Shreve, 535 F.3d 225, 241 (4th Cir. 2008)).  A "serious medical need" is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention."  Iko, 535 F.3d at 241 (internal quotation marks omitted).

To constitute deliberate indifference to a serious medical need, "the treatment [a prisoner receives] must be so grossly incompetent, inadequate, or excessive to shock the conscience or to be intolerable to fundamental fairness." Miltier v. Beorn, 896 F.2d 848, 851 (4th Cir. 1990), *overruled on other grounds by* Farmer v. Brennan, 511 U.S. 825, 825 (1994).

The Plaintiff has failed to forecast any evidence that the Defendants were deliberately indifferent to a serious medical need.  Assuming *arguendo* that priapism and urine retention are serious medical needs, he has failed to demonstrate that the Defendants actions, or failure to act, were deliberately indifferent.  When PA Patane saw the Plaintiff on September 5, the Plaintiff requested opioid pain medication for a *history* of priapism, although he did not have priapism or urine retention at that time.  Although PA Patane found that treating the Plaintiff with opioids was not called for at that time, he did not ignore Plaintiff's pain and prescribed him Amitriptyline.  When the Plaintiff declared a medical emergency that night, he was seen by a nurse and was able to provide a urine sample.  He requested opioids again even though he still did not have priapism, and his request was again denied.  The Plaintiff went into urine retention at some point between the 9:10 p.m. nurse's visit and 5:20 a.m. the following morning.   He began declaring medical emergencies on September 6 at 10:00 a.m., and LPN O'Keefe saw him less

than two-and-a-half hours later at 12:25 p.m. While the Plaintiff contends that LPN O'Keefe did not properly examine him, refused to treat him, and falsified her notes about the examination and his symptoms, he has not presented a forecast of admissible evidence to support any of those assertions. The Plaintiff has forecast evidence only of a discrepancy between the blood pressure reading he believes to be accurate of 142/124 and the reading that LPN O'Keefe charted of 148/106. He has not, however, forecast any evidence that this error was intentional or resulted from anything more than negligence. Indeed, LPN O'Keefe's notes report that the Plaintiff did not have priapism and that she conveyed the Plaintiff's complaints to PA Patane. Further, while the Plaintiff alleges that Nurse Allen was present at his visit with O'Keefe and failed to evaluate or treat him, he has failed to forecast any evidence regarding Nurse Allen whatsoever.

It is undisputed that PA Patane came to see the Plaintiff within about one-and-a-half hours of reviewing LPN O'Keefe's notes from the 12:25 p.m. visit. PA Patane asserts, and the Plaintiff has failed to rebut, that the Plaintiff was able to freely walk around the cell and appeared to move without pain at that time. The Plaintiff has forecast evidence that he told PA Patane about his urine retention and pain during that visit and that Patane said he was "[not] worried about it." [Doc. 12-1 at 14: Plaintiff Affid. at ¶ 9]. Although PA

23

Patane concluded, in the totality of the Plaintiff's symptoms and presentation, that the Plaintiff's transfer to an outside facility for catheterization was not warranted at that time, he increased the Amitriptyline dosage for the Plaintiff's continued complaints of pain. [Doc. 68: Patane Affid. at ¶¶ 29, 46]. The Plaintiff's assertion that PA Patane "gave [him] no medical treatment at all" on September 6 is contradicted by his own admission that Patane promptly saw him in his cell and increased his pain medication. [Doc. 12-1 at 14: Plaintiff Affid. at ¶¶ 9, 12; see Doc. 26: Second Am. Compl. at 8 (acknowledging the Amitriptyline prescription)]. When a nurse saw the Plaintiff on September 7 at around 1:17 a.m. for his continued emergency medical calls, he was transported to the hospital for treatment of the urine retention and pain. Upon arriving at the hospital, the Plaintiff was "uncomfortable but not toxic," had no abnormal findings aside from urine retention, and was able to void a total of approximately 1020 cc of urine. [Doc. 68-9: Patane Ex 9 at 2-3; Doc. 68-10: Patane Ex 10 at 2; Doc. 68: Patane Affid. at ¶ 31; Doc. 12-1 at 14: Plaintiff Affid. at ¶¶ 17-18].

The foregoing reveals that the Plaintiff's complaints were not ignored; the Plaintiff was repeatedly seen and offered treatment and was ultimately sent to the hospital. The fact that the Plaintiff did not receive the treatment that he preferred is insufficient to show deliberate indifference. See Scinto

v. Stansberry, 841 F.3d 219, 225 (4th Cir. 2016) ("mere 'disagreements between an inmate and a physician over the inmate's proper medical care' are not actionable absent exceptional circumstances."). Further, that the care was not error-free or as prompt as the Plaintiff might have wished does not rise to the level of deliberate indifference to the Plaintiff's serious medical needs. See Miltier, 896 F.2d at 852 (mere negligence or malpractice does not violate the Eighth Amendment). The forecast of evidence demonstrates a disagreement with the Plaintiff regarding his course of care and, at most, misdiagnosis or negligence.

For all these reasons, the Court concludes that the Plaintiff has failed to demonstrate the existence of any genuine dispute of a material fact with regards to the medical care that he received at MVCI. Therefore, the Defendants will be granted summary judgment as to this claim.[25]

---

[25] This applies equally to the deliberate indifference claim against Nurse Allen, which involves the 12:25 p.m. interaction between the Plaintiff and LPN O'Keefe. The Plaintiff had notice and the opportunity demonstrate the existence of a genuine dispute of material fact with regards to that incident, and failed to do so. See Allstate Ins. Co. v. Fritz, 452 F.3d 316, 323 (4th Cir. 2006) (district court has inherent power to grant summary judgment *sua sponte* as long as the nonmoving party had "notice 'sufficient to provide it with an *adequate opportunity* to demonstrate a genuine issue of material fact.'" (quoting U.S. Development Corp. v. Peoples Fed. Sav. & Loan Ass'n, 873 F.2d 731, 735 (4th Cir. 1989) (emphasis added)).

## C. Retaliation

The Plaintiff alleges that LPN O'Keefe refused to examine and treat him and falsified his medical records, which interfered with and delayed his medical care, in retaliation for his statement that he was going to sue her. [Doc. 26: Second Am. Compl. at 8-9].

The First Amendment right to free speech "includes not only the affirmative right to speak, but also the right to be free from retaliation by a public official for the exercise of that right." Suarez Corp. v. McGraw, 202 F.3d 676, 685 (4th Cir. 2000). Prison officials may not retaliate against an inmate for exercising a constitutional right. See Hudspeth v. Figgins, 584 F.2d 1345, 1347 (4th Cir.1978). In order to state a colorable retaliation claim under § 1983, a plaintiff must allege: "(1) [ ]he engaged in protected First Amendment activity, (2) the defendant[ ] took some action that adversely affected [his] First Amendment rights, and (3) there was a causal relationship between [his] protected activity and the defendant['s] conduct." Martin v. Duffy, 858 F.3d 239, 249 (4th Cir. 2017) (quoting Constantine v. Rectors & Visitors of George Mason Univ., 411 F.3d 474, 499 (4th Cir. 2005)). In the prison context, retaliation claims are treated with skepticism because "[e]very act of discipline by prison officials is by definition 'retaliatory' in the sense

that it responds directly to prisoner misconduct." Adams v. Rice, 40 F.3d 72, 74 (4th Cir. 1994).

The Defendants have presented a forecast of evidence to establish that LPN O'Keefe did not refuse to examine or treat the Plaintiff, or falsify his symptoms or other medical information. [Doc. 65-4: O'Keefe Decl. at ¶¶ 6-8; Doc. 68-6: Patane Ex 6 at 2-3]. The Plaintiff has forecast evidence only that a discrepancy exists between the blood pressure reading he believes to be accurate and the reading charted by LPN O'Keefe. [Doc. 12-1 at 14: Plaintiff Affid. at ¶ 8]. However, he has failed to forecast any admissible evidence of a causal relationship between this discrepancy and the Plaintiff's protected conduct. Accordingly, Defendant O'Keefe will be granted summary judgment on Plaintiff's retaliation claim.

### D. Qualified Immunity

The Defendants also argue that they are entitled to qualified immunity. "Qualified immunity protects officers who commit constitutional violations but who, in light of clearly established law, could reasonably believe that their actions were lawful." Henry v. Purnell, 652 F.3d 524, 531 (4th Cir. 2011) (*en banc*). "To determine whether an officer is entitled to qualified immunity, the court must examine (1) whether the plaintiff has demonstrated that the officer violated a constitutional right and (2) whether that right was clearly

established at the time of the alleged violation." E.W. ex rel. T.W. v. Dolgos, 884 F.3d 172, 178 (4th Cir. 2018) (internal quotation marks omitted). The doctrine of qualified immunity "gives government officials breathing room to make reasonable but mistaken judgments and protects all but the plainly incompetent or those who knowingly violate the law." Smith v. Ray, 781 F.3d 95, 100 (4th Cir. 2015) (internal quotation marks omitted).

Here, because Plaintiff has not presented a forecast of evidence that the Defendants violated a constitutional right, the Defendants are also entitled to qualified immunity. Therefore, the Court grants summary judgment for the Defendants on this ground as well.

### E. Default

Finally, the Plaintiff seeks the entry of default against Nurse Allen because, he argues, she was served but failed to answer or otherwise defend the Complaint. [Doc. 71].

The Plaintiff is mistaken; Nurse Allen did file an Answer and no default has occurred. [Doc. 43]. Therefore, the Plaintiff's request for entry of default against Nurse Allen is denied.

## IV. CONCLUSION

For the reasons stated herein, the Court will grant Defendants O'Keefe and Patane's Motions for Summary Judgment [Docs. 63, 66]. The Plaintiff's

Declaration for Entry of Default against Defendant Allen [Doc. 71] is denied, and the Court will dismiss the claims against Defendant Allen *sua sponte* pursuant to 28 U.S.C. § 1915(e)(2).

## ORDER

**IT IS, THEREFORE, ORDERED** that:

1. Defendants O'Keefe and Patane's Motions for Summary Judgment [Docs. 63, 66] are **GRANTED** and this action against these Defendants is **DISMISSED WITH PREJUDICE**.

2. The Plaintiff's Declaration for Entry of Default against Defendant Tamara Allen [Doc. 71] is **DENIED**.

3. **IT IS FURTHER ORDERED** that the Plaintiff's claims against Defendant Allen are **DISMISSED WITH PREJUDICE.**

The Clerk is respectfully directed to terminate this action, and mail the Plaintiff a copy of this Order at his address of record as well as at the Eastern Correctional Institution, Box 215, Maury NC 28554.

**IT IS SO ORDERED.**

Signed: January 26, 2022

Martin Reidinger
Chief United States District Judge